IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GREGORY WILLIAMSON,            )
                              )
           Petitioner,         )
                              )
    v.                         )      No. 03 C 8697
                              )
                              )      Judge Mark Filip
BLAIR LEIBACH,                 )
                              )
           Respondent.         )

## MEMORANDUM OPINION AND ORDER DISMISSING
## PETITION FOR WRIT OF HABEAS CORPUS

Gregory Williamson ("Williamson" or "Petitioner"), has filed a petition for a writ of

habeas corpus ("Petition") against Blair Leibach, the warden of Danville Correctional Center in

Danville, Illinois. Petitioner challenges the constitutionality of the state court conviction and

judgment under which he is incarcerated. For the reasons explained below, Williamson's

Petition for a writ of habeas corpus is respectfully denied.

### BACKGROUND

Williamson is imprisoned pursuant to a judgment of the Illinois courts. Following a jury

trial, he was convicted of first-degree murder and was sentenced to 30 years imprisonment, with

no good-time credits available. (D.E. 13, Ex. C at 1.)[1]

---

[1]     The facts are typically taken from the Illinois appellate court's resolution of Petitioner's
appeals. *See, e.g., Ashford v. Gilmore*, 167 F.3d 1130, 1131 (7th Cir. 1999) (citing 28 U.S.C. §
2254(e)(1)). Any additional facts are taken from Williamson's statement of the facts on direct
appeal (D.E. 13, Ex. A) or from the trial transcript. (D.E. 16.) Docket entries are designated as
"D.E. ___," followed by the appropriate district court docket number.

On November 11, 1995, Williamson and Fairleigh Jones ("Jones"), both members of the "Gangster Disciples" street gang, asked an acquaintance of Williamson's, Antwon Stepney ("Stepney"), to drive them to a "guy's house to get some money." (*Id.* at 2.) The "guy" was Joseph Gilchrist ("Gilchrist"), who lived at an apartment complex in Joliet, Illinois, and who owed a $600 drug debt to Jones. (*Id.*; *see also id.*, Ex. A at 5, 14.) During the drive to Gilchrist's apartment, Williamson and Jones both stated that if Gilchrist did not have the money, they would have to "beat him down." (*Id.*, Ex. C at 2.) During this time, Stepney did not see any weapons. (*Id.*) Upon arriving at the apartment, Petitioner and Jones asked Stepney to wait outside, and Stepney complied. (*Id.*)

Petitioner and Jones "were gone approximately seven minutes." (*Id.*) The exact sequence of events that transpired during those seven minutes is unknown. Williamson made conflicting statements to several individuals, in which he variously admitted that he murdered Gilchrist and also claimed that Jones was the killer. (*E.g.*, *id.*, Ex. N at 2 (court of appeals explaining that Williamson "made conflicting statements to several individuals, in which defendant variously admitted that he had killed Gilchrist or placed blame on Jones"); *id*, Ex. O at 3-4 (stating that after the attack on Gilchrist, "Williamson told Jones that, 'you know, when that dude fell, he was breathing his last breath'" (quoting trial testimony of Stepney)).) One thing is for certain: someone "beat down" Gilchrist, who was stabbed to death and left lying in a pool of blood on the landing of his apartment building. (*Id.*, Ex. A at 5.)

When Williamson and Jones returned to the car, they had Stepney drive them to a shoe store to return a pair of shoes. (*Id.*, Ex. C at 2.) During this ride, Stepney saw Williamson pull a knife out of his pocket or sleeve and slip the knife under the console between the seats. (*Id.*)

Williamson exhorted Jones not to "tell on" him; Jones replied that he would not say anything. (*Id.*) Williamson and Jones had Stepney drive them to a few other stops, during which time Williamson and Jones were in a celebratory mood, flashing gang signs and stating that they had "handled" the person they had seen. (*Id.*) During a stop at the home of Williamson's aunt, Stepney looked to see if the knife was still under the console while Petitioner was inside the house; the knife was gone. (*Id.*) At some point while driving Jones and Williamson around, Stepney also learned that Jones was supposed to pay Williamson $60 and give him some cocaine for helping Jones "handle" Gilchrist. (*Id.* at 2-3.)

After Gilchrist's corpse was discovered in the landing of his apartment building, the police investigation zeroed in on Williamson as the principal suspect; Petitioner was subsequently arrested and tried for Gilchrist's murder.[2] (*Id.* at 1.) Stepney was the State's witness at trial. (*Id.* at 1-2.) Among other evidence, the State also presented Randy Green, a "jailhouse informant" who testified that Williamson had made incriminating statements while they were cellmates at the Will County detention facility. (*Id.*, Ex. A at 9.) His testimony appears to have been consistent, as to various details at least, with that of Stepney. (D.E. 16, Ex. R at 525.)

The prosecutor, in closing argument, argued that Williamson's post-stabbing actions spoke louder than did his various conflicting accounts about who was the killer and what had occurred. (*See, e.g.*, *id.* at 493-96.) The argument included the following passage:

---

[2]     Jones's absence from the proceedings is not explained in the record—he was not indicted for Gilchrist's murder nor was he called to testify at Williamson's trial. However, Petitioner has not raised any objections to Jones's absence in his Petition.

Look, every version he [Williamson] gives there is little bit more evidence against him, he is trying to explain it away, but he has never given you the entire version in any of these statements . . . . In fact, when you look at what's probably the most likely statement, what's closest to the truth, look at how he [Williamson] was acting right after the event took place because he wasn't thinking right away that the police were on to him, he wasn't charged with anything, he was celebrating, he was happy for what he accomplished, he and Fairleigh Jones. He was happy about stabbing Joseph Gilchrist, because you know what, that made him a GD [Gangster Disciple] to the bone.

It wasn't until after people started investigating him that he came up with this other stuff, it wasn't me, I have to come up with self-defense then. Now I got to get out of this. Look at what he was doing right after and how he was acting right after, and that's probably the closest indication you are going to have from him as to what actually happened. And in the way he is acting, it's clear that he had a heck of a lot more to do in this than laying down at the bottom landing as he watched Fairleigh Jones stab Joseph Gilchrist. You look at the way he was acting, he was the one doing the stabbing.

(*Id.*, at 495-96; *see also* D.E. 1 at 5 (citing D.E. 16, Ex. R. at 496 (quoting one sentence of argument)).)

In the defense closing, defense counsel argued that the evidence showed that "Fairleigh Jones killed the man [Gilchrist]." (D.E. 16, Ex. R at 502.) The defense did not question that Williamson was present at the killing, nor that Williamson "went there to collect some money for Fairleigh Jones, to help Fairleigh collect some money, from a man who weighed 130 pounds." (*Id.*) The defense argued that Stepney was "a liar" (*id.* at 503), as were Green and other State witnesses. (*E.g.*, *id.* at 504-09.) The defense also rhetorically asked the jury:

Where is Fairleigh? We know Fairleigh talked to the police and gave a taped statement. He was in custody that day and released, not to be heard from again. He is not here to tell you what happened. He is the only other man in this world that can tell you what happened at 300 Union. But he is not here. He is not here to explain why there is blood on his shoe. He is not here to explain why there is blood on his pants. [. . . .] He is not here to explain away what he said or didn't say to Antwon Stepney on the 12th to intimidate him. He is not here to say Gilchrist owed me 600 bucks for drugs. He is not here to say what happened at the top of those stairs when he knocked on the door. He is not here to tell you that he got his pound of flesh. He is the man who murdered Joseph Gilchrist.

4

(*Id.*, at 513-14.) The defense also told the jury to make the State "explain where Fairleigh Jones is." (*Id.* at 514.)

The State began its rebuttal by stating that "[t]he Defense made great points," and then the State began to attempt to rebut them. (*Id.*, at 518.) The prosecution explained that Jones would take Williamson to "do a beat down" on a 130-pound man (a question the defense had raised) because both Jones and Williamson were cowards. (*Id.*) The prosecution added that "we will never know exactly what happened," because the only person who could truthfully tell the jury what happened the night of the murder was Gilchrist, and Williamson had foreclosed that possibility by killing him. (*Id.*; *see also* D.E. 13, Ex. N at 2 (discussing trial arguments).) The prosecutor said that Petitioner was willing to tell the police anything to get out from under the charge, but the truth came from the witnesses who testified in court, including people like Stepney, who lived in a neighborhood controlled by Gangster Disciples and showed courage by coming forward to testify against one of the gang members. (D.E. 16, Ex. R at 518; *see also*, *e.g.*, *id.* at 522, 527.) Finally, the prosecutor stated that even if Williamson did not stab Gilchrist, he was responsible under Illinois accountability principles for Jones's actions in any event on the evidence adduced in the case. (*Id.*, Ex. N at 2-3.) The jury received an instruction on the defendant's right not to testify; it also received an instruction on Illinois's accountability principles. (*Id.* at 3.) After deliberation, Williamson was found guilty and received a thirty-year prison sentence. (*Id.* at 1.)

On direct appeal, Petitioner argued that he received ineffective assistance of trial counsel when his attorney did not request an accomplice instruction regarding Stepney's testimony and that Illinois's truth-in-sentencing law (making petitioner ineligible to receive good-time credits)

was unconstitutional due to Illinois's legislation-single-subject rule. (*Id.*, Ex. A) The appellate court affirmed Petitioner's conviction, finding that there was no ineffective assistance of counsel for failing to ask for the instruction because the evidence made clear that Stepney was not an accomplice and therefore "it would have been improper to give an accomplice-witness instruction to the jury." (*Id.*, Ex. C at 5.) Further, the appellate court, applying *People v. Reedy*, 708 N.E.2d 1114 (Ill. 1999), and accepting a State concession on the issue, modified Petitioner's sentence to allow good-time credits against his 30-year term. (D.E. 13, Ex. C at 5.) Petitioner sought leave to appeal to the Illinois Supreme Court; he was denied leave to appeal on April 5, 2000, in an unpublished summary order. *See People v. Williamson,* 729 N.E.2d 503 (Ill. 2000).[3]

On August 24, 1998, while his direct appeal was pending, Williamson filed a *pro se* motion for relief from judgment under 735 ILCS 5/2-1401, which was subsequently converted into a petition for post-conviction relief. (D.E. 13, Ex. D.) After the court appointed him counsel, Williamson was granted leave to file an amended petition. (*Id.*, Ex. G.) In response to the prosecution's motion to dismiss (*id.*, Ex. I), Williamson filed his second amended petition, which substantially mirrored the claims raised in the first amended petition. (*Id.*, Ex. H.) Specifically, Williamson raised three ineffective assistance of counsel (trial and appellate)[4] claims: (1) failure to object to alleged defects in the physical evidence (*id.* at 2-4); (2) failure to object to several of the prosecutor's comments during closing argument and rebuttal (*id.* at 4-5);

---

[3]     The Court does not have Williamson's petition for leave to appeal, but this appears to be of no consequence to the current proceedings because Williamson's habeas petition does not raise either of the issues he raised on direct appeal.

[4]     The Court addresses Williamson's ineffective assistance of trial counsel and ineffective assistance of appellate counsel claims in tandem throughout this opinion because both claims rely upon the same operative set of facts and legal principles.

and (3) failure to investigate and interview potential witnesses. (*Id.* at 5.) While Williamson's *pro se* petition identified *Strickland v. Washington*, 466 U.S. 668 (1984), his second amended petition did not identify a federal or state constitutional basis for his claims.

On March 20, 2001, the circuit court dismissed Williamson's post-conviction petition. (*Id.*, Ex. J.) The circuit court acknowledged Williamson's ineffective assistance of counsel claim with respect to the physical evidence (*see id.* at 1), in the course of summarily dismissing the entire petition because "the allegations in the petition . . . [did] not support a claim of substantial deprivation of constitutional rights." (*Id.* at 3.) In terms of Williamson's potential-witnesses claim, the circuit court reasoned that the decision of Williamson's counsel not to call the suggested witnesses, who would place Williamson "at the scene of a crime with the intention to commit a criminal act," was "well within bounds of appropriate representation." (*Id.* at 2; *see also id.* ("The witnesses that the Defendant alleges should have been called to testify at his trial all placed the Defendant at the scene of the crime with Jones."); *id.* at 3 ("All of the witnesses had Jones bringing the Defendant [*i.e.*, Williamson] along to help him collect the drug debt.").) Finally, the circuit court rejected Williamson's improper-comments claim because the prosecutor accurately stated Illinois law with respect to accomplice liability, and the circuit court concluded by stating that the allegations in Williamson's petition did not support a claim of a substantial deprivation of a constitutional right. (*Id.* at 2-3.)

On appeal from the denial of his post-conviction petition, Williamson presented his ineffective-assistance claims relating to the prosecutor's comments on Williamson's decision not to testify at trial and the prosecutor's explanation of accountability principles. (*Id.*, Ex. K.) However, Williamson did not present his failure-to-investigate-witnesses or his failure-to-object-

to-physical-evidence claims. (*Id.*) Williamson's brief identified *Strickland v. Washington*, 466 U.S. 668 (1984), as the governing standard for ineffective assistance of counsel claims. However, the reasons why counsel allegedly was ineffective were both entirely argued as issues of Illinois law; no federal cases or constitutional provisions were cited beyond *Strickland*. (*See* D.E. 13, Ex. K at 1-2 (Table of Authorities).)

On July 19, 2002, the appellate court affirmed the denial of Williamson's post-conviction petition. (*Id.*, Ex. N.) The appellate court explained that a person does not receive ineffective assistance of counsel when his attorney does not raise substantively meritless issues or objections. (*Id.* at 4 ("If the underlying issue has no merit, a defendant cannot be considered to have suffered prejudice from appellate counsel's failure to brief the issue.").) With respect to the purported comments on Williamson's decision not to testify, the court, applying state-law principles, determined that the remarks were proper because they were intended to rebut defense counsel's claims that the State's witnesses lacked credibility. (*Id.* at 5.) In this regard, the appellate court stated that a review of the record made "apparent that the comments in question were not designed to improperly focus the jury's attention on defendant's failure to testify, but to focus on the testimony presented at trial and to hold defendant accountable for the murder." (*Id.*) The appellate court rejected the Illinois-accountability-law-comments claim because "the context of the prosecutor's rebuttal comment made it clear that the agreement between [Williamson] and Jones included use of [Williamson's] 'muscle' to batter the victim if he resisted collection efforts." (*Id.* at 5-6.) The appellate court further reasoned that Illinois's common-design rule made Williamson accountable for the murder because it was in furtherance of the intended crime of battery. (*Id.* at 6.) Finally, the appellate court noted that the jury received appropriate,

8

accurate instructions on the petitioner's right not to testify and on Illinois's law of criminal accountability. (*Id.*) The appellate court, in summary, affirmed the rejection of Williamson's ineffective assistance claims with respect to his trial and his appellate counsel. (*Id.*)

Williamson subsequently filed a *pro se* petition for leave to appeal to the Illinois Supreme Court. (*Id.*, Ex. O.) Petitioner argued that defense counsel was ineffective for failing to object to the prosecutor's comments during closing argument and in not contacting certain potential witnesses. (*Id.*) Williamson's petition identified *Strickland* as a federal basis for his ineffective assistance of counsel claim and identified *Griffin v. California*, 380 U.S. 609 (1965), as the controlling federal case on prosecutorial comments relating to the defendant's decision to remain silent. (D.E. 13, Ex. O at 12.) The Illinois Supreme Court denied leave to appeal on December 5, 2002, without a written opinion. (*Id.* at 18.)

On December 1, 2003, Williamson filed the petition for writ of habeas corpus that is before the Court. (D.E. 1.) The Petition suggests three grounds for habeas relief: (1) Williamson received ineffective assistance of trial counsel when defense counsel did not object to the prosecutor's comments allegedly referencing Williamson's decision not to testify (*id.* at 5); (2) Williamson received ineffective assistance of appellate counsel when appellate counsel did not argue the prosecutor's comments were plain error under Illinois law (*id.* at 6)[5]; and (3) Williamson received ineffective assistance of counsel and was deprived of due process of law due to trial counsel's alleged failure to investigate, locate, and/or call potential witnesses. (*Id.*)

---

[5]     As discussed below, the petition might also raise a standalone, substantive claim under the Fifth Amendment, but Williamson does not flag it as such. (*See* D.E. 1 at 5.) As explained further below, this claim is waived and, independently, affords no basis for habeas relief in any event.

DISCUSSION

I.     Standard of Review

The grounds upon which a federal district court may issue a writ of habeas corpus for a

person imprisoned pursuant to a state court criminal judgment are subject to meaningful limits.

First, habeas relief can be granted "only on the ground that [a prisoner] is in custody in violation

of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  The Court

cannot grant habeas relief on grounds that a state court incorrectly applied state law, except to the

extent that such application also violated federal law.  *See Dellinger v. Brown*, 301 F.3d 758, 764

(7th Cir. 2002) ("Federal habeas relief is only available to a person in custody on violation of the

United States Constitution or laws or treaties of the United States, . . . and is unavailable to

remedy errors of state law.").

Second, the Court may not provide habeas relief unless Petitioner has exhausted his

available remedies in state courts.  28 U.S.C. § 2254(b)(1)(A).  Exhausting all state remedies

includes presenting each claim on appeal to the Illinois appellate court and in a petition to the

Illinois Supreme Court for discretionary review.  *See, e.g., O'Sullivan v. Boerckel*, 526 U.S. 838,

845 (1999); *Hadley v. Holmes*, 341 F.3d 661, 664 (7th Cir. 2003) (holding that the rule applies

for purposes of habeas corpus under Section 2254).  This rule applies to claims presented in

petitions for state post-conviction relief, as well as to claims contained in direct appeals from

criminal courts.  *See, e.g., White v. Godinez*, 192 F.3d 607, 608 (7th Cir. 1999) *(per curiam)*.

Exhaustion occurs when the petitioner has fairly presented his claim to the state courts by

arguing not only the federal legal principles but also the operative facts of the claim, thereby

giving the state courts a "'meaningful opportunity to pass upon the substance of the claims later

presented in federal court.'" *Chambers v. McCaughtry*, 264 F.3d 732, 737-38 (7th Cir. 2001) (quoting *Rodriguez v. Scillia*, 193 F.3d 913, 916 (7th Cir. 1999)); *see also Chambers*, 264 F.3d at 738 ("The petitioner must have placed both the operative facts and the controlling legal principles before the state courts") (collecting cases). Federal courts should "avoid hypertechnicality" when conducting the "meaningful opportunity" analysis; however, a petitioner must "alert fairly the state court to the federal issue and . . . permit that court to adjudicate squarely that federal issue." *Verdin v. O'Leary*, 972 F.2d 1467, 1474 (7th Cir. 1992). In this regard, "[a] petitioner may reformulate his claims somewhat, so long as the substance of his argument remains the same." *Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001) (citation omitted); *accord Sweeney v. Carter*, 361 F.3d 327, 332-33 (7th Cir. 2004). "A petitioner's reformulation of his claim, however, should not 'place the claim in a significantly different posture by making the claim stronger or more substantial.'" *Chambers*, 264 F.3d at 738 (quoting *Boyko*, 259 F.3d at 788).

Third, habeas relief is ordinarily not available for claims that have been "procedurally defaulted" in state proceedings. "If the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on the resolution of those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition." *Coleman v. Thompson*, 501 U.S. 722, 735 (1991). However, the Court may not review a claim if "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* at 735 n.1.

The Court may excuse procedural default when there is cause for the default and prejudice as a result of the alleged violation of federal law or where a refusal to consider the claim would result in a fundamental miscarriage of justice. *See Dellinger*, 301 F.3d at 766. To show cause for a default, Petitioner must offer an excuse that cannot fairly be attributed to him. For example, conduct by a petitioner's counsel that is constitutionally ineffective under *Strickland* constitutes cause. However, a claim that, for example, ineffective assistance was sufficient cause for a procedural default can itself be procedurally defaulted if it is not properly presented to state courts. *See Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000); *Dellinger*, 301 F.3d at 766-67.

In order to establish that a fundamental miscarriage of justice has occurred, Petitioner must demonstrate by clear and convincing evidence that, but for the alleged violation of federal law in the state court proceedings, no reasonable juror would have convicted him. *Dellinger*, 301 F.3d at 767 (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). In other words, the exception is "limited to situations where the constitutional violation has probably resulted in a conviction of one who is actually innocent." *Id.* Due to the prior finding of guilt by the factfinder, a petitioner alleging a fundamental miscarriage of justice bears the burden of proof. *See Buie v. McAdory*, 341 F.3d 623, 626-27 (7th Cir. 2003).

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), 110 Stat. 1214 (1996), placed additional restrictions on federal habeas relief for a person imprisoned pursuant to the judgment of a state court. Prior to AEDPA's enactment, "federal courts disregarded the state court's legal conclusions and reached independent judgments on the issues presented to them, but deferred to the state court's findings of fact." *Agnew v. Leibach*, 250 F.3d 1123, 1128-29 (7th

12

Cir. 2001). Under the AEDPA, the state court judgment must violate federal law and it must either be "contrary to, or involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or be "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A judgment is "contrary to" Supreme Court precedent if the state court made a statement of law inconsistent with one made by the Supreme Court, or if the state court decided a case with "materially indistinguishable facts" differently from the Supreme Court. *Huynh v. Bowen*, 374 F.3d 546, 548 (7th Cir. 2004) (citing *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). The state court need not even be aware of the applicable Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 7-8 (2002) (*per curiam*).

A state court decision is an "unreasonable application of" clearly established law "if the state court identifies the correct governing legal principle from the [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Cossel v. Miller*, 229 F.3d 649, 654 (7th Cir. 2000) (citing *Williams*, 529 U.S. at 413). As the Seventh Circuit has repeatedly instructed, the unreasonable application prong of Section 2254(d)(1) is "a difficult standard to meet." *Floyd v. Hanks*, 364 F.3d 847, 850 (7th Cir. 2003) (citation omitted); *Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003); *see also Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002) (holding that "unreasonable," for purposes of Section 2254(d)(1), means "something like lying well outside the boundaries of permissible differences of opinion"). The Court is not permitted to substitute its independent judgment as to the correct outcome; it may only ask if the state court's decision was reasonable. *See Washington v. Smith*, 219 F.3d 620,

628 (7th Cir. 2000); *Huynh*, 374 F.3d at 548 ("An unreasonable application is not simply what we might deem to be an incorrect or erroneous application of federal law.").

With respect to ineffective assistance claims under *Strickland*, the Seventh Circuit has repeatedly instructed that, in determining reasonableness, this Court must afford great deference to the state courts' application of the *Strickland* standard. *See Murrell v. Frank*, 332 F.3d 1102, 1111 (7th Cir. 2003). The Seventh Circuit has repeatedly taught that "only a clear error in applying *Strickland* would support a writ of habeas corpus," *id.* (quoting *Dixon v. Snyder*, 266 F.3d 693, 700-01 (7th Cir. 2001)), such that the assessment of the state courts' regarding *Strickland* was not even "minimally consistent with the facts and circumstances of the case." *Id.* at 1112 (quoting *Sanchez v. Gilmore*, 189 F.3d 619, 623 (7th Cir. 1999)).

Section 2254(e)(1) requires a federal court, in a habeas proceeding, to presume that a determination of a factual issue made by a State court is correct. "The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*; *accord, e.g., Ruvalcaba v. Chandler*, 416 F.3d 555, 559-60 (7th Cir. 2005) (citing *Mendiola v. Schomig*, 224 F.3d 589, 592 (7th Cir. 2000)).

II.     Analysis

A.     Failure to Object to Prosecutor's Alleged Comments on Williamson's Silence

Williamson argues that his trial counsel was ineffective for failing to object to the prosecutor's comments during closing arguments that allegedly referenced his decision not to testify at trial. (D.E. 1 at 5.) Petitioner further argues that appellate counsel was ineffective for failing to raise this issue on direct appeal. (*Id.* at 6.) The Court analyzes these ineffective-assistance claims in tandem because they share a virtually identical factual and legal basis.

14

Petitioner suggests four objectionable comments, the first made during the prosecutor's

initial closing argument and the other three made during rebuttal:

- Comment 1: "Look at what he [Defendant] was doing right after and how he was acting right after, and that's probably the closest indication you are going to have from him as to what actually happened." (D.E. 1 at 5 (citing D.E. 16, Ex. R at 496).)

- Comment 2: "And we will never know exactly what happened because the only man who can truthfully tell us what happened, he got a knife stuck in him through his side all the way through him into his aorta, and he bled to death on a stairwell landing. And that's the only way we will know truly the exact gory details of what happened here, and this man eliminated that from happening." (*Id.* (citing D.E. 16, Ex. R at 518-19).)

- Comment 3: "The defendant will tell you through the police anything he can tell you to get out of this charge, and who wouldn't. But that is not the truth. The people who have it up for grabs and up for stake came to you on that witness stand and told you the truth, and there is no reason to disbelieve them, none." (*Id.* (citing D.E. 16, Ex. R at 522).)

- Comment 4: "We don't know how he [Gilchrist] was attacked. We can come up with any type of scenario as to where the person, Mr. Williamson, was when he stabbed him . . ." (*Id.* (citing D.E. 16, Ex. R at 526).)

To obtain habeas relief on this claim, Williamson must first demonstrate that the

prosecutor's comments violated the Fifth Amendment and then show that his trial and appellate

counsel were ineffective for failing to raise this issue while representing him.

1.     Exhaustion and Procedural Default

Petitioner raised objections to Comment 1 and Comment 3 his second amended post-

conviction petition. (*Id.*, Ex. H at 4-6.) The circuit court did not address these comments

individually, but in rejecting Williamson's argument that the prosecutor misstated Illinois law as

to accountability, the court concluded that "the comments by the Prosecutors were all within the

bounds of reaso[n]." (*Id.*, Ex. J at 2-3.) In his post-conviction appeal, Petitioner identified

Comments 2, 3, and 4 in support of his claim. (*Id.*, Ex. K at 15.) The appellate court held that

there was no ineffective assistance of counsel because, *inter alia*, the "[r]emarks indicating that the victim was the only one who could have truthfully told who stabbed [Gilchrist] were in response to implications made in defense counsel's closing argument." (*Id.*, Ex. N at 5.) In this regard, the appellate court noted that defense counsel had questioned the credibility of the state's witnesses, asked where he was, and argued that Jones, the man who went with Petitioner to get the money from Gilchrist, was the actual killer; otherwise, he would have been brought as a witness by the prosecution. (*Id.*) The appellate court concluded that the prosecutor's comments were aimed at focusing the jury on the testimony presented at trial. (*Id.*) The appellate court either did not notice or did not think it important that Williamson did not identify Comment 2 in his second amended post-conviction petition. In his petition for leave to appeal to the Illinois Supreme Court, Williamson identified Comments 2, 3, and 4 in support of his claim. His petition for leave to appeal was summarily denied. (*Id.*, Ex. O at 13.)

Petitioner exhausted the ineffective-assistance component of this claim by presenting it to the Illinois Court of Appeals and the Illinois Supreme Court for review. The slight variance in the closing statements identified as supporting the ineffective assistance of counsel claim at various times (which variance does not materially alter the strength or weakness of the claim) does not mean that the claim was not exhausted. The Illinois courts were given a fair warning of the factual basis (the State's closing statements) and the legal bases (the Fifth and Sixth Amendments) for the claim. The Illinois Court of Appeals did not think that Petitioner raised a "new" claim on his post-conviction appeal; the court reviewed Williamson's claim on the merits, rather than dissecting the petitions to determine which of the statements identified in the appeal were also identified in the second amended petition. (*See id.*, Ex. K.) Because the Illinois court

16

reviewed the claim on the merits without ruling that the claim was procedurally defaulted, there is no procedural bar to federal review of the claim.[6] *See Harris v. Reed*, 489 U.S. 255, 262 (1989).

However, Petitioner never presented an independent, standalone Fifth Amendment claim to the state courts. Instead, his claim was always presented and argued as an ineffective assistance claim. Thus, this putative standalone Fifth Amendment claim has not been exhausted, *see Chambers*, 264 F.3d at 737-38, and is procedurally defaulted because Williamson would not be able to raise it in a subsequent post-conviction petition. *See, e.g., Lemons v. O'Sullivan*, 54 F.3d 357, 360 (7th Cir. 1995) (collecting authorities and holding that issues that could have been but were not raised on direct appeal or post-conviction review are typically forfeited). A putative standalone claim is also, as explained below, independently of no utility to Petitioner because the claim is substantively meritless in any event.

### 2. Fifth Amendment Issues

The Fifth Amendment precludes a prosecutor from directly commenting on the defendant's decision not to testify. *See Griffin v. California*, 380 U.S. 609, 615 (1965) ("The Fifth Amendment, . . . in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."); *accord Yancey v. Gilmore*, 113 F.3d 104, 106 (7th Cir. 1997). In *Griffin*, the prosecutor directly commented on the defendant's silence: specifically, the prosecution argued for the defendant's guilt based on, "[t]hese things he [the defendant] has not

---

[6]     The claim was not raised in a post-trial brief and thus may have been waived. However, the Illinois Appellate Court made no mention of this possibility, and thus the Court considers the claim on the merits.

seen fit to take the stand and deny or explain." *Id.* at 611.

Under Seventh Circuit precedent, indirect comments constitute a *Griffin* violation when "'it was the prosecutor's manifest intention to refer to the defendant's silence,'" or "'the remark was of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's silence.'" *Rodriguez v. Peters*, 63 F.3d 546, 561 (7th Cir. 1995) (quoting *United States v. Donovan*, 24 F.3d 908, 916 (7th Cir. 1994)). *Peters* and similar cases reflect the Seventh Circuit's gloss on *Griffin*—as Seventh Circuit precedent also teaches, the Supreme Court has never pronounced that *Griffin* extends to indirect comments. *See, e.g., Yancey*, 113 F.3d at 107 ("Comments by the prosecutor on the state of the evidence that may indirectly refer to the defendant's silence . . . have not been the subject of direct Supreme Court guidance.") (further citation and internal quotation marks omitted). An indirect statement involves a prosecutor's description of the government's evidence as "unrebutted" or "uncontradicted," which can, under Seventh Circuit law, be impermissible where it is highly likely that the defendant is the only person able to contradict the evidence. *See, e.g., United States v. Sblendorio*, 830 F.2d 1382, 1391 (7th Cir. 1987).

A Fifth Amendment claim fails on the merits for multiple, independent reasons in this habeas case. First, the prosecutor's comments were not direct comments about Williamson's decision not to testify at trial; none of the four comments mimics those deemed objectionable by *Griffin*. Comment 1 could, in a vacuum, possibly be interpreted as a reference to Williamson's choice not to testify, but, when placed it context, it is more convincingly understood as a comparison between Williamson's after-the-fact actions and his later, multiple, inconsistent statements to the police and others about what occurred. (*See* D.E. 16, Ex. R at 493-96 (State's

18

references to Petitioner's varied accounts of events).) Petitioner presents no authority to question the propriety of closing argument that, in essence, restates the familiar saying that one's (pretrial, indeed, preinvestigation) actions speak louder than one's (inconsistent, and again, pretrial) words.

Comment 2 was an argument that only the victim would truthfully recount what happened—the prosecutor likely would say something similar even if Williamson had testified because it would call into question his presumed protestations of innocence on the stand. Moreover, the rebuttal comment was responsive to an issue the defense had emphasized in its argument: the absence of testimony from Jones, described by the defense as "the only other man in this world who can tell you what happened at 300 Union." (*Id.* at 513; *see also id.* at 513-14 ("But he is not here. He is not here to explain [any number of questions defense counsel suggested]."); *id.* at 515 (defense counsel telling the jury, "Let them explain where Fairleigh Jones is.").)

Comment 3, in the context of a case where Williamson had told the police varied and, at least in part, exculpatory accounts of the events, is also not properly or fairly understood as a comment on Williamson's failure to testify at trial. Instead, it is an explanation of why Williamson's explanations to the police should not be understood to exonerate him. Even more pointedly, it was a rebuttal to the defense's extended attack on the credibility of the State witnesses who inculpated Williamson. The prosecutor was not arguing that Williamson's silence was evidence of his guilt; to the contrary, he was claiming that Williamson through the police had made false statements to try to "get out of this charge." (*Id.* at 522).) The prosecutor then compared Williamson's motives to the State's witnesses, who were willing to bear the risk of

19

testifying without anything to gain personally and much potentially to lose. This was consistent with the State's argument that Stepney had shown courage in testifying against a Gangster Disciple, even though he lived in a neighborhood controlled by the Gangster Disciples.[7] (*Id.*) The Court further notes that Comment 3 or something similar to it certainly would have been made even if Williamson had testified (*i.e.*, that he would say things to try to beat the charge), further militating against any idea that it was a comment on Williamson's silence at trial as opposed to an attack on the veracity of his prior, inconsistent statements to the police.

Comment 4 is not related to Williamson's decision not to testify; instead, this comment was made as part of the prosecutor's claim that the killer was cowardly because he stabbed Gilchrist in the back. (*Id.* at 522-23.) It also was part of a broader argument that, irrespective of whether Williamson was the actual stabber or Jones was, Williamson was guilty under the law—just like all of Jesse James's accomplices were guilty of the robberies and related violence, irrespective of whether they were lookouts or tied up the victims or put the money in the bags. (*Id.* at 524.) Thus, none of Comments 1 through 4 affords any basis for relief.

Second, and independently, even if the Court were mistaken that none of the comments constituted references or condemnations of Williamson's decision not to testify at trial, Williamson still would have no winning claim on habeas review. The Supreme Court has never extended the prohibition in *Griffin* to cover indirect comments. Consequently, Williamson cannot obtain habeas relief in connection with his state conviction on the basis of putative indirect comments. *See, e.g., Yancey,* 113 F.3d at 106-07 (holding that indirect comments not

---

[7]     Stepney had testified that prior to the trial, he received a note with Gangster Disciple symbols on it that threatened to kill him if he testified at trial. (*See* D.E. 16 at 287.)

ground for habeas relief because the Supreme Court has never extended *Griffin* to indirect comments and § 2254 requires that the state-court decision be contrary to or an unreasonable application of federal law as determined by the Supreme Court) (collecting cases).

Third, even if the Supreme Court had adopted the Seventh Circuit's doctrine on indirect comments, the comments at issue in this case would not constitute impermissible indirect references. (The Court has discussed why none of these comments were direct references to the Defendant's decision not to testify in the preceding paragraphs, and the Court will endeavor not to be repetitive when discussing the indirect-comment issue, although a certain degree of overlap is unavoidable.)

In this regard, none of the comments invites the jury to infer Williamson's guilt from his decision not to testify at trial. Petitioner was not the only person present at the scene and capable of contradicting the government's evidence; Jones was also there, a factor noted by the defense and significant under applicable caselaw condemning indirect references to a Fifth Amendment invocation. *See, e.g., United States v. Alanis*, 265 F.3d 576, 586 (7th Cir. 2001) (prosecutor's comments about defendant's silence only improper if defendant is the only one who could have contradicted, rebutted, or disputed the evidence) (collecting cases); *Yancey*, 113 F.3d at 106.

Furthermore, in this regard, the prosecutor may comment on the defendant's decision not to testify in response to defense counsel claims or comments, even under caselaw condemning indirect comments. *See, e.g., United States v. Robinson*, 485 U.S. 25, 32 (1988) ("[W]here as in this case the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel, . . . there is no violation of the privilege."); *Donovan*, 24 F.3d at 916 (discussing prosecution's ability to respond to issues raised or opened by defense in

its closing argument); *Sblendorio*, 830 F.2d at 1394. Comments 2 and 3 are reasonably understood as invited responses to defense comments during closing arguments. In closing argument, the defense questioned Stepney's credibility and questioned why the other possible witness to the crime, Jones, did not testify. In response during rebuttal, the prosecution made Comments 2 and 3. With Comment 2, the prosecutor directly addressed Stepney's purported lack of credibility and Jones's absence by pointing out that only the victim could "truthfully" report what happened inside the building. With Comment 3, the prosecutor responded to attacks on Stepney's credibility by contrasting the varying initial statements made by Petitioner to the police and those of the allegedly more consistent and credible statements by witnesses in the case, such as Stepney. Immediately following Comment 3, the prosecutor continued, "[a]nd every version that Mr. Stepney told was that Mr. Williamson had the knife." (D.E. 16 at 522). In addition, the jury was instructed on defendant's right not to testify (D.E. 13, Ex. N at 3), which further mitigates against any finding that the prosecutors' comments impermissibly burdened Petitioner's privilege against self-incrimination because it diminishes the risk of any prejudice to Williamson from the comments. *See, e.g., Rodriguez*, 63 F.3d at 562 (collecting cases). In summary, there were no indirect references to or condemnations of Williamson's decision not to testify, and even if there had been, no cognizable harm would be shown.

Fourth, and again independently, the state court's application of federal law was not unreasonable. Even if the Court disagreed with the state court's analysis, which it does not, the state court decision was not so unreasonable as to warrant habeas relief under AEDPA's deferential standard of review. *See* 28 U.S.C. § 2254(d)(1).

Williamson's claim that his counsel was ineffective for failing to protect his right against

22

self-incrimination under Illinois law (presumably Art. I, § 10 of the Illinois Constitution) fails for the reasons stated above. His claim under state law is no stronger than his federal claim because Illinois courts have read *Griffin* narrowly.[8] Illinois only prohibits comments relating to the defendant's silence when "the reference was intended or calculated to direct the attention of the jury to the defendant's neglect to avail himself of his legal right to testify." *People v. Dixon*, 438 N.E.2d 180, 182-83 (Ill. 1982) (internal quotation marks, punctuation, and citations omitted); *accord Barrow*, 549 N.E.2d 240, 259 (Ill. 1989). Furthermore, Illinois law permits a prosecutor to state that the evidence is uncontradicted, even when the defendant is the only person who could contradict the State's evidence. *See, e.g., id.* (collecting cases). Finally, Illinois permits a prosecutor to comment on a defendant's silence if it is in reply to arguments made by the defendant. *See, e.g., Dixon*, 438 N.E.2d at 182 (collecting cases). Since Williamson has not advanced a meritorious claim under the more demanding Seventh Circuit approach, he necessarily lacks a meritorious claim under Illinois jurisprudence interpreting *Griffin*, as the Illinois courts found.

### 3. Ineffective Assistance of Counsel

As explained above, if Petitioner's underlying claims are meritless, then his counsel was not ineffective for failing to raise those meritless claims at trial or on appeal. *See, e.g., Howard v. Gramley*, 225 F.3d 784, 791 (7th Cir. 2000).

Even if the Court were incorrect in its analysis above, Williamson's ineffective assistance

---

[8]     The Illinois courts have not made it clear whether their decisions rely upon state or federal law and the language of the relevant provisions is virtually identical. *Compare* U.S. Const., amend. V ("No person shall be compelled in any criminal case to be a witness against himself") *with* Ill. Const, art. I, § 10 ("No person shall be compelled in a criminal case to give evidence against himself").

of counsel claims would not constitute a basis for habeas relief. To show a basis for relief on the *Strickland*/ineffective assistance claims, Williamson would need to show that the appellate court decisions against him were contrary to or an unreasonable application of federal law concerning ineffective assistance of counsel. As the facts in Williamson's case are not substantially similar to those in *Strickland*, the decision was not contrary to federal law, so Williamson must show that the state court unreasonably applied *Strickland*. In determining reasonableness, precedent teaches that this Court must afford great deference to the state courts' application of the standard set forth in *Strickland*. *See Murrell v. Frank*, 332 F.3d 1102, 1111 (7th Cir. 2003). As the Seventh Circuit has repeatedly instructed, "'*only a clear error* in applying *Strickland* would support a writ of habeas corpus,'" *id.* (quoting *Snyder*, 266 F.3d at 700-01) (emphasis in *Murrell*), such that the assessment of the state courts' regarding *Strickland* was not even "'minimally consistent with the facts and circumstances of the case.'" *Id.* at 1112 (quoting *Sanchez v. Gilmore*, 189 F.3d 619, 623 (7th Cir. 1999)). Furthermore, a federal habeas court must presume that all the state court's factual determinations, including credibility determinations, are correct, unless rebutted by clear and convincing evidence. *Id.* at 1112 (citing *Collier v. Davis*, 301 F.3d 843, 848 (7th Cir. 2002)). In *Strickland*, the Supreme Court established the framework under which claims of ineffective assistance of counsel are analyzed:

> First, the defendant must show that counsel's performance was deficient. This requires showing that the counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of . . . a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.*, 466 U.S. at 687.

To satisfy the first prong, Petitioner would need to show that defense "'counsel's representation fell below an objective standard of reasonableness.'" *Gallo-Vasquez v. United States*, 402 F.3d 793, 798 (7th Cir. 2005) (quoting *Strickland*, 466 U.S. at 688)). The Seventh Circuit teaches that when considering the effectiveness of an attorney's performance, a district court must "'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at 689). A defendant "must direct . . . [the Court] to the specific acts or omissions which form the basis of his claim; the court must then determine whether, in light of all the circumstances, the alleged acts or omissions were outside the wide range of professionally competent assistance." *Fountain v. United States*, 211 F.3d 429, 434 (7th Cir. 2000) (internal quotation marks and citation omitted). Courts are to "indulge a strong presumption" of competence such that "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks and citation omitted). A court should not simply second-guess a defense counsel's representation after a conviction or adverse sentence has occurred, because the benefit of hindsight is likely to distort the complexity of the challenges presented and the reasonableness of a defense counsel's decision on a real-time basis. *See id.* ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight . . . . Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ."). Most criminal cases result in convictions; that does not mean that most defense counsel are acting in a

constitutionally deficient or unreasonable manner, or are making constitutionally defective strategic judgments. *See, e.g., Fountain*, 211 F.3d at 434 ("[M]any trial determinations, like so many other decisions that an attorney must make in the course of representation, are a matter of professional judgment. Thus, we must resist a natural temptation to become a 'Monday morning quarterback.'") (internal punctuation and citations omitted).

The standard for evaluating the adequacy of appellate counsel is quite similar: the court must decide whether it was "within the realm of competent appellate representation to decline to raise a particular point on appeal," taking into consideration the arguments available to counsel and the applicable standard of review. *Gramley*, 225 F.3d at 790-91. Courts then consider whether counsel's decisions represented the same kind of strategic choices permitted for trial decisions. *See id.* at 791. The Supreme Court has made clear that a defense counsel is not required to inundate an appellate court with every non-frivolous issue to provide constitutionally competent counsel. *See Smith v. Robbins*, 528 U.S. 259, 288 (2000). Indeed, the Supreme Court has stated that counsel "should not" pursue this strategy (*id.*)—at least normally—because the defense function typically requires judgment and strategy calls in the selection of arguments and issues, so as "to maximize the likelihood of success on appeal." *Id.* Where defense counsel has presented some arguments and issues, but not others, "it is difficult to demonstrate that counsel was incompetent." *Id.* (citation omitted).

For purposes of the second prong of the *Strickland* analysis, a petitioner must demonstrate prejudice by some "'reasonable probability.'" *Gallo-Vasquez*, 402 F.3d at 798 (quoting *Strickland*, 466 U.S. at 694). Put differently, Petitioner must demonstrate "'a probability [of prejudice] sufficient to undermine confidence in the outcome'" of the case. *Id.*

(quoting *Strickland*, 466 U.S. at 694). This probability is determined under the totality of circumstances. *See Strickland*, 466 U.S. at 695. This standard does not require the petitioner to convince the court that his attorney's ineffectiveness more likely than not altered the outcome in the case. *Id.* at 693.

Petitioner has not shown that his trial counsel's failure to object to the comments fell below an objective standard of reasonableness. Failure to object to the comments meant that the issue was not preserved for review on appeal. *See People v. Evans*, 808 N.E.2d 939, 956 (Ill. 2004) (failure to object to comments waives issue on appeal; plain error review only applies). However, the allegedly improper comments were not constitutionally impermissible for multiple reasons, as explained above. Thus any objection to the comments (or claim on direct appeal regarding them) was unlikely to be successful, and counsel's failure to object and preserve the issue for full review cannot be viewed as unreasonable or as prejudicial to the outcome. *See Gramley*, 225 F.3d 784 at 791.

With respect to Williamson's ineffective assistance of appellate counsel claim, the issue regarding the remarks is not clearly stronger than the issues that the appellate counsel pursued on direct appeal, particularly the successful claim that made Williamson eligible for good-time credits on his thirty-year sentence. (*See* D.E. 13, Ex. A at 1.) Petitioner's appellate counsel did not fall below an objective standard of reasonableness, and the appellate court's determination that no ineffective assistance of counsel occurred is not an unreasonable application of the *Strickland* standard.

In addition, Petitioner was not prejudiced (over and above the problems presented for him by the baseless nature of the claims) because of the significant evidence to support his

conviction. Petitioner admitted that he participated as "the muscle" to help Jones collect money from the victim. (D.E. 16, Ex. R at 502.) Forensic DNA evidence revealed that the victim's blood was on Petitioner's black jacket, to a certainty of 1 in 1,900 among African-Americans. (*Id.* at 462.) A witness testified to seeing Petitioner hide a knife in the car afterwards, and the knife was subsequently found in his girlfriend's apartment. (D.E. 13, Ex. C at 2.) Moreover, the Petitioner admitted his guilt to a cell mate. (*Id.*, Ex. O at 6.) Most important, and as succinctly summarized by the Illinois circuit court on post-conviction review:

> All of the witnesses had Jones bringing the [Petitioner] along to help him collect a drug debt. In the light most favorable to the Petitioner, a scuffle ensued in an effort to collect that drug debt and the Petitioner was knocked down the stairs. As part of the efforts to collect the drug debt, a fight ensued which lead to the death of [the victim], being stabbed not by [Petitioner] but by Jones. Under the law, it is clear and unequivocal that both Jones and [Petitioner] could be found guilty of the murder.

(*Id.*, Ex. J at 3.) Thus, in the case at hand, the evidence of Williamson's guilt under Illinois law and accountability principles was overwhelming. No cognizable error or miscarriage of justice has been shown.

B.    Failure to Investigate and Call Favorable Witnesses

Petitioner argues that his Sixth Amendment constitutional right to effective assistance of counsel was denied when his trial counsel failed to "investigate, locate, and/or call witnesses who lived in the building where the murder . . . took place." (D.E. 1 at 6). Petitioner did not raise this claim on appeal of the dismissal of his post-conviction petition (*see* D.E. 13, Ex. K); consequently, it was not exhausted because claims for post-conviction relief must be presented for a full round of appellate review. *See White*, 192 F.3d at 608. It is procedurally defaulted since Illinois procedural rules would prohibit Williamson from raising this claim at this juncture.

*See Coleman*, 501 U.S. at 735 n.1; *see also Lemons*, 54 F.3d at 360 (collecting authorities and holding that issues that could have been but were not raised on direct appeal or post-conviction review are typically forfeited).

Petitioner has not shown cause for this default—he has not alleged ineffective assistance of counsel in his post-conviction proceedings, nor could he. *See, e.g., Pennsylvania v. Finley*, 481 U.S. 551, 559 (1987). Nor, independently, has Williamson shown prejudice or a miscarriage of justice. In light of the proof against Williamson, it is not realistic to suspect that any constitutional violation resulted in the conviction of an innocent man. (*See* D.E. 13, Ex. J at 3); *see also Dellinger*, 301 F.3d at 767.

Furthermore, and again independently, this claim fails on the merits. The *Strickland* test requires both "performance below an objective standard of reasonableness" and proof of a "reasonable probability" that the outcome was affected by the deficiency. *Strickland*, 466 U.S. at 689, 694. Petitioner has not shown that trial counsel's performance fell below such a standard. As the trial court explained, trial counsel's failure to call witnesses or investigate more was within the scope of reasonable representation; in fact, the Illinois appellate court explained, his attorney might have been ineffective if he had called witnesses proposed, who placed Williamson at the scene of the crime with Jones, and typically with the intent to collect a drug debt and to use force if necessary to achieve their common goal. (*See* D.E. 13, Ex. J at 2 ("The witnesses that the Defendant alleges should have been called to testify at his trial all placed the Defendant at the scene of the crime with Jones. Witnesses also placed the Defendant and Jones at the scene of the crime with the intention to collect a drug debt and to use force, if necessary, to achieve their common goal. Certainly, a defense attorney would be well within the bounds of appropriate

29

representation by not calling witnesses who placed the Defendant at the scene of a crime with the intention to commit a criminal act. In doing so, it could easily lead to a jury convicting the Defendant of the crime.").) Furthermore, none of Williamson's alleged witnesses would have eliminated his responsibility for Gilchrist's death via accomplice liability. (*See id.* at 3 ("The Court is of the opinion that the failure to call the witnesses whose testimony is set out as part of the second amended petition is well within the bounds of properly defending Mr. Williamson. If an attorney were to emphasize that Williamson was present at the scene, and the reasons that he was present at the scene, one could argue that the attorney was ineffective for highlighting those facts.").) Even putting aside the obvious potential hearsay problems with aspects of the proposed witnesses' testimony, Williamson does not maintain that any of these alleged witnesses would contradict Stepney's testimony that Williamson and Jones agreed to use physical force, if necessary, to collect the debt from Gilchrist. Finally, even if the Court disagreed with the state court's resolution of this issue, it is certainly within the bounds of reasonable legal analysis, and thus the Court cannot provide habeas relief on this claim. *See, e.g.*, *Floyd*, 364 F.3d at 850; *Hardaway*, 302 F.3d at 762.

## CONCLUSION

For the reasons set forth above, Williams' petition for habeas corpus is respectfully denied.

So ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Dated: *12-15-05*